STATE of Minnesota, ex rel. Andrew
Allen GUTH, petitioner,
Appellant,

v.

Joan FABIAN, Commissioner of
Corrections, Respondent.

No. A05–1554.

Court of Appeals of Minnesota.

June 13, 2006.

Review Denied Aug. 15, 2006.

Andrew Allen Guth, Moose Lake, MN, pro se appellant.

Brent D. Wartner, Assistant Legal Counsel, St. Paul, MN, for respondent.

Considered and decided by STONEBURNER, Presiding Judge; KALITOWSKI, Judge; and WILLIS, Judge.

## OPINION

WILLIS, Judge.

In this appeal from the denial of a petition for a writ of habeas corpus, appellant

contests his removal from the challenge incarceration program (CIP) and the "abscond/escape charge" on his prison record. Because these arguments lack merit, we affirm in part. Appellant also argues that the time he served during phase I of the CIP should be applied against his term of imprisonment. Because Minn.Stat. § 244.171, subd. 4 (2004), does not prohibit applying against the term of imprisonment of an offender removed from the CIP the number of days that he served in a state correctional facility during phase I of the program, we reverse in part and remand to the district court to recalculate appellant's remaining term of imprisonment.

## FACTS

In February 2003, appellant Andrew Allen Guth pleaded guilty to second-degree controlled-substance crime and was sentenced to an executed 44–month prison term, with 71 days of jail credit. The sentence was to be served consecutively to the executed sentence that Guth was then serving for a conviction of theft of a motor vehicle.

In November 2003, Guth was approved for participation in the challenge incarceration program (CIP), which is a three-phase, community-integration program for eligible nondangerous-drug and property offenders that includes rigorous physical training, work and education programs, chemical-dependency treatment, intensive supervision and surveillance, random drug and alcohol testing, and a high level of offender accountability. An offender completes phase I, commonly called "boot camp," in a participating Minnesota correctional facility and completes phases II and III at a pre-approved residence, under the supervision of an assigned supervising agent.

Before entering the CIP, Guth signed an agreement that includes the following provision:

I understand and agree that violation of any of the rules of the facility may constitute grounds for termination of my CIP status and return to a Minnesota Correctional Facility, and that if my CIP status is terminated the time served in the CIP will not be credited toward my original term of imprisonment.

Between November 13, 2003, and May 9, 2004, Guth completed phase I of the CIP. On May 10, 2004, Guth began phase II of the CIP, during which he was permitted to live at his parents' residence after he agreed to certain conditions of release, including a provision that he would "maintain contact with [his supervising agent] as directed" and "at all times follow the instructions of the agent." During phase II, Guth tested positive for alcohol, for which he received an intermediate sanction; Guth claimed that there was beer in a marinating sauce that he tasted. And in July 2004, Guth was cited for failing to maintain contact with his supervising agent. Guth admitted to the violation, and his conditions of release were restructured to require 30 days of electronic home monitoring.

In November 2004, Guth began phase III of the CIP, and, according to his supervising agent, he "appeared to be doing well." Guth was employed and attending college part time. On November 14, 2004, Guth's father called Guth's supervising agent and reported that Guth had not been living at his parents' house since November 6, 2004; that Guth had been in an accident with his motor vehicle; and that Guth was "again hanging out with his 'using' friends." Guth's supervising agent called Guth that evening, leaving a numeric page on Guth's cell phone, but Guth did not return his agent's call. Guth's super-

vising agent also verified that Guth was not at his residence at 10:40 p.m., despite the fact that Guth had a 10:30 p.m. curfew. So, on November 14, 2004, Guth's supervising agent obtained an arrest warrant, and Guth was taken into custody on November 19, 2004. Guth's supervising agent cited him for failing to inform his agent of his residence and activities, failing to maintain contact with his supervising agent as directed, and failing to follow his supervising agent's instructions. Guth's supervising agent recommended that Guth be removed from the CIP.

At his revocation hearing, Guth denied all three of his supervising agent's allegations. Guth claimed that he was having problems with his cell phone; that he had turned his cell phone off the evening of November 14, 2004; and that he never received the numeric page. Guth also claimed that he did not believe that the 10:30 p.m. curfew applied on the nights he was attending school, that he "had no idea that there had been a warrant issued," and that he "had not been directed to turn himself [in]." The hearing officer dismissed the allegation that Guth had failed to reside at an approved residence because "the standard of proof [had] not been met." But the hearing officer found that Guth had violated the conditions of his release by failing to maintain contact with his supervising agent and by not being available to his supervising agent at Guth's residence at 10:40 p.m. on November 14, 2004. The hearing officer revoked Guth's CIP status and returned him to serve his original prison term. Guth appealed to the executive officer of the hearings-and-release unit, who affirmed the hearing officer's decision.

In May 2005, Guth filed a petition for a writ of habeas corpus, arguing that (1) there was no evidence that he violated the conditions of his release; (2) the revocation hearing officer was biased; (3) that "a five-day abscond/escape charge" was improperly placed on his record for the dates November 14 through 19, 2004; and (4) the time he served during phase I of the CIP should be applied against his term of imprisonment. The district court denied Guth's petition without an evidentiary hearing. This appeal follows.

## ISSUES

1. Did the revocation hearing officer abuse her discretion by revoking Guth's CIP status?

2. Was "an abscond/escape charge" wrongly placed on Guth's record?

3. Should the number of days that Guth spent in a state correctional facility during phase I of the CIP be applied against his term of imprisonment?

## ANALYSIS

On appeal from the denial of a petition for a writ of habeas corpus, the district court's findings are entitled to great weight and they will be sustained if they are reasonably supported by the evidence. *Northwest v. LaFleur,* 583 N.W.2d 589, 591 (Minn.App.1998), *review denied* (Minn. Nov. 17, 1998). Questions of law, however, are subject to de novo review. *State ex rel. McMaster v. Benson,* 495 N.W.2d 613, 614 (Minn.App.1993), *review denied* (Minn. Mar. 11, 1993).

A writ of habeas corpus is a statutory civil remedy available "to obtain relief from [unlawful] imprisonment or restraint." *Loyd v. Fabian,* 682 N.W.2d 688, 690 (Minn.App.2004) (quoting Minn.Stat. § 589.01 (2000)), *review denied* (Minn. Oct. 19, 2004); *see* Minn.Stat. § 589.01 (2004). A writ of habeas corpus may also be used to raise claims involving fundamental constitutional rights and significant restraints on a defendant's liberty or to challenge the

conditions of confinement. *See, e.g., Kelsey v. State,* 283 N.W.2d 892, 895 (Minn. 1979) (noting that habeas corpus may be used to challenge prison conditions as cruel and unusual punishment).

## I.

■■■ Guth argues that he was wrongfully removed from the CIP. The commissioner of corrections "shall impose severe and meaningful sanctions for violating the conditions of the [CIP]," including removing an offender from the program if the offender "commits a material violation of or repeatedly fails to follow the rules of the program." Minn.Stat. § 244.171, subd. 4 (2004). The rules for a supervised-release revocation govern the process for removing an offender from the CIP, and those rules provide that a revocation hearing must be held. Minn.Stat. §§ 244.171, subd. 4(3), .05, subd. 2 (2004); *see also* Minn. R. 2940.3500–.4500 (2003). If a revocation hearing officer finds that an offender is "in violation of [his] ... supervised release," the hearing officer may revoke the supervised release and return the offender to prison. Minn. R. 2940.3700. Revocation is justified when there is enough evidence to satisfy the decision-maker that the conduct of the offender does not meet the conditions of his release. *United States v. Strada,* 503 F.2d 1081, 1085 (8th Cir.1974). This court reviews a decision to revoke an offender's release for a clear abuse of discretion. *State v. Schwartz,* 615 N.W.2d 85, 90 (Minn.App.2000), *aff'd,* 628 N.W.2d 134 (Minn. June 28, 2001).

■■■ Guth argues that there is insufficient evidence to support the revocation hearing officer's findings that Guth violated the conditions of his release by failing to maintain contact with his supervising agent as directed and by failing to follow his supervising agent's instructions by violating his curfew. The record shows that the hearing officer based her findings on the facts that both "Guth and [his supervising agent] confirm[ed] that there was no contact between [Guth] and [the] agent between [November 14 and November 19, 2004]" and that the supervising agent stated that Guth was not at his residence after his 10:30 a.m. curfew on November 14, 2004. Because this is sufficient evidence to support the findings that Guth violated the conditions of his release and because these violations are sufficient to justify revocation, we conclude that the hearing officer did not abuse her discretion by revoking Guth's CIP status.

■■■ Guth argues that his supervising agent lied about leaving a numeric page on Guth's cell phone on the evening of November 14, 2004. The record shows that Guth's supervising agent consistently stated that he left a numeric page on Guth's cell phone that evening. Guth told the hearing officer that his cell phone was not working and that he had turned it off that evening. The hearing officer chose to believe Guth's supervising agent. This court defers to a fact-finder's credibility determinations. *See, e.g., Sefkow v. Sefkow,* 427 N.W.2d 203, 211–12 (Minn.1988) (deferring to a district court's credibility determinations); *Jenson v. Dep't of Econ. Sec.,* 617 N.W.2d 627, 631 (Minn.App.2000) (deferring to the credibility determination of the representative of the commissioner of economic security), *review denied* (Minn. Dec. 20, 2000). And regardless of whether Guth's supervising agent left him a numeric page, Guth violated the conditions of his release by not being home before his 10:30 p.m. curfew that night, and this alone is a sufficient basis for revocation.

■■■ Guth argues that his supervising agent's recommendation to revoke Guth's CIP status was improperly based on Guth's prior violations. But the commis-

sioner may revoke an offender's CIP status for "repeatedly fail[ing] to follow the rules of the program." Minn.Stat. § 244.171, subd. 4(1). Therefore, by statute, a hearing officer may consider prior violations of CIP rules when determining whether to remove an offender from the program.

Guth also argues that he "was denied his right to an impartial hearing officer [because the revocation hearing officer] only listened to the recommendations of the parole agent and did not seek out any other facts, testimony or evidence." But the record shows that the hearing officer considered Guth's version of the events that led to his revocation, and Guth does not suggest what "other facts, testimony or evidence" the hearing officer should have considered. The fact that the hearing officer decided against Guth does not alone show that she was biased against him. *Cf. State v. Laughlin,* 508 N.W.2d 545, 548 (Minn.App.1993) (stating that judicial bias cannot be based simply on a litigant's subjective belief); *Olson v. Olson,* 392 N.W.2d 338, 341 (Minn.App.1986) (stating that prior adverse rulings do not constitute bias).

## II.

Guth argues that because he did not know that there was a warrant for his arrest and he "did not deviate from his pre-approved work/school/residence routine," "an abscond/escape charge" was wrongly placed on his record. The record shows that Guth absconded from supervision from November 14 through November 19, 2004: Guth failed to maintain contact with his supervising agent by failing to respond to his agent's numeric page; Guth was not at his residence before his 10:30 p.m. curfew on November 14, 2004; and Guth was not taken into custody until November 19, 2004. This is sufficient evi-

dence to support the determination of the Department of Corrections (DOC) that Guth absconded from supervision for five days. When an offender has absconded from supervision, the issuance of a warrant "shall stop the time from running on the sentence until the [offender] is returned to custody." Minn. R. 2940.4400, subp. 3 (providing also that a warrant may be issued when an offender "has absconded from supervision"). Therefore, the DOC was justified in stopping the five days during which Guth absconded from running on Guth's sentence.

Guth argues that by prolonging his term of imprisonment by five days to account for the five days that he absconded, the DOC violated the separation-of-powers doctrine because the "imposition of sentences ... is exclusively a judicial function that cannot be delegated to executive agencies." The Minnesota Supreme Court has concluded, however, that "the commissioner's statutory authority over supervised and conditional release operates within and does not impede the court's sentencing authority." *State v. Schwartz,* 628 N.W.2d 134, 140–41 (Minn.2001) (concluding that the commissioner's addition of a five-year conditional-release term because sex offender violated the terms of his probation did not violate the separation-of-powers doctrine).

Guth also argues that his record of absconding now "adversely affects [his] minimum custody status and programming options such as vocation school [and] work release." But there is no constitutional right to or liberty interest in prison programming, and therefore, it is not an appropriate matter for habeas corpus relief. *State ex rel. McMaster v. Young,* 476 N.W.2d 670, 674 (Minn.App. 1991) (holding that inmate has "no liberty interest in his custody status classification nor in access to rehabilitative programs in

the Minnesota prison system"), *review denied* (Minn. Dec. 13, 1991). And if an inmate's "custody classification is not arbitrary or capricious but is pursuant to Department of Corrections policies and procedures," such a classification does not warrant habeas corpus relief. *Id.* at 673–74. Guth does not dispute that the DOC's policies and procedures were properly followed in determining his custody classification. Because the evidence supports the finding that Guth absconded from supervision, which is the basis for his current custody classification, and because Guth has no liberty interest in participating in prison programs, we conclude that his claims arising from his record of absconding do not warrant habeas corpus review.

### III.

Guth argues that the days he spent completing phase I of the CIP in a state correctional facility—November 13, 2003, to May 9, 2004—should be "deducted from his sentence." *See* Minn.Stat. § 244.172, subd. 1 (2004) (providing that during phase I of the CIP an "offender must be confined in a state correctional facility"). The district court concluded that Guth was not entitled to credit for time served while in the CIP, citing *Seaborn v. Roehrich*, No. C4–02–351, 2002 WL 2004867 (Minn.App. Sept. 3, 2002), to support its conclusion. The commissioner also cites *Seaborn* to support her argument that "the calculation of prison time is not affected by the time spent in CIP if the offender is terminated from the program." But the analysis in *Seaborn* does not apply here. First, the appellant in *Seaborn* argued that he was entitled to "good-time" credit for the time

he was in the CIP, which is not the issue here.[1] Guth is seeking credit for time served, not "good time" credit. *Id.* at *1. Second, the court in *Seaborn* cited Minn. Stat. § 244.171, subd. 3 (2004), to support its conclusion that an offender who is terminated from the CIP is "not entitled to 'good time,' *or any reduction in sentence*, for his time spent in CIP." *Id.* at *2–*3 (emphasis added). But subdivision 3 refers only to good-time credit and does not address a reduction of a prison term on any other basis; therefore, the *Seaborn* court's reference to "any reduction in sentence" is dictum. And finally, *Seaborn*, as an unpublished case, has no precedential value. *See* Minn.Stat. § 480A.08, subd. 3(c) (2004) (providing that "[u]npublished opinions of the court of appeals are not precedential"); *Chamberlain v. Chamberlain*, 615 N.W.2d 405, 411 n. 1 (Minn.App. 2000) (stating that "[u]npublished opinions are of limited value in deciding an appeal"), *review denied* (Minn. Oct. 25, 2000).

The commissioner argues that the following statutory language shows that the "legislature specifically mandated that those removed from CIP shall not receive credit for time served in CIP against their sentences":

> An offender who is removed from the challenge incarceration program shall be imprisoned for a time period equal to the offender's term of imprisonment, minus earned good time if any, but in no case for longer than the time remaining in the offender's sentence. "Term of imprisonment" means a time period equal to two-thirds of the sentence origi-

---

1. "Good time" is defined as "the period of time by which an inmate's term of imprisonment is reduced pursuant to section 244.04." Minn.Stat. § 244.01, subd. 5 (2004). Subdivision 1 of section 244.04 (2004) states that good time is the reduction in the duration of an eligible offender's term of imprisonment "by one day for each two days during which the inmate violates none of the disciplinary offense rules promulgated by the commissioner."

nally executed by the sentencing court, minus jail credit, if any.

Minn.Stat. § 244.171, subd. 4. The record shows that Guth signed at least two agreements, one before entering phase I and one before entering phase II of the CIP, in which he acknowledged that he understood and accepted the fact that he would not receive any reduction in his sentence for time spent in the CIP if he did not successfully complete the program. These agreements also include the above language from Minn.Stat. § 244.171, subd. 4. There is no published caselaw interpreting this statute. Therefore, whether an offender may receive credit for time served in a correctional facility during phase I of the CIP is a matter of first impression.

■ This court need not defer to an administrative agency's interpretation of a statute. *Brula v. St. Louis County,* 587 N.W.2d 859, 861 (Minn.App.1999), *review denied* (Minn. Mar. 30, 1999). But if the statutory language is technical in nature and the agency's interpretation is long-standing, the agency's interpretation is entitled to some deference. *Special Sch. Dist. No. 1 v. E.N.,* 620 N.W.2d 65, 68 (Minn.App.2000). Here, the language of the statute is not technical. And although the commissioner's interpretation of Minn. Stat. § 244.171, subd. 4, is incorporated into the DOC's CIP agreements, the record shows that the DOC's revocation hearing officer told Guth at the end of his hearing that he would receive credit for the time he served in a correctional facility during phase I of the CIP. Therefore, the DOC does not interpret Minn.Stat. § 244.171, subd. 4, consistently.

■ Minn.Stat. § 244.171, subd. 4, does not provide that time served in phase I of the CIP should be excluded from the calculation of the term of imprisonment of an offender who is removed from the program. And this court cannot supply what the legislature has deliberately omitted or inadvertently overlooked. *State v. Jones,* 587 N.W.2d 854, 856 (Minn.App.1999), *review denied* (Minn. Mar. 16, 1999). Not applying the days that Guth actually served in prison against his term of imprisonment is also generally inconsistent with the caselaw on jail credit [2] or "custody credit." *See, e.g., Asfaha v. State,* 665 N.W.2d 523, 528 (Minn.2003) (concluding that "fairness and equity demand that jail credit be awarded" when "the level of confinement and limitations imposed are the functional equivalent of those imposed at a jail, workhouse, or regional correctional facility" and awarding jail credit for time spent at a treatment facility to an offender's executed sentence after the offender violated the conditions of his probation). Therefore, we conclude that an offender who is removed from the CIP is entitled to the application of the number of days served in phase I of the CIP against his term of imprisonment. We remand to the district court to recalculate Guth's term of imprisonment. If necessary, the district court may re-open the record to receive additional evidence regarding the dates that Guth was in custody.

## DECISION

Because the record supports the determination that Guth was properly removed from the CIP and absconded from supervision for five days in November 2004, we affirm in part. Because Minn.Stat. § 244.171, subd. 4 (2004), does not prohibit

---

**2.** Minnesota statutes do not define the term "jail credit," but the term has been used to mean that an offender's term of imprisonment is reduced by the number of days the offender spends "in custody in connection with the offense or behavioral incident for which sentence is imposed." Minn. R.Crim. P. 27.03, subd. 4(B).

credit for the days served in a state correctional facility during phase I of the CIP against the term of imprisonment of an offender who is removed from the CIP, we reverse in part and remand to the district court to recalculate Guth's remaining term of imprisonment.

**Affirmed in part, reversed in part, and remanded.**